UNITED STATES of America, Plaintiff,

v.

**Juozas KUNGYS, Defendant.**

**Civ. A. No. 81–2305.**

United States District Court,
D. New Jersey.

Dec. 20, 1983.

See also 571 F.Supp. 1104.

W. Hunt Dumont, U.S. Atty., Newark, N.J. by Joseph F. Lynch and Jovi Tenev, U.S. Dept. of Justice, Criminal Div., Washington, D.C., for plaintiff.

Williamson & Rehill by Donald J. Williamson, Newark, N.J., Ivars Berzins, Babylon, N.Y., for defendant.

## OPINION

DEBEVOISE, District Judge.

This is an action which the United States instituted pursuant to 8 U.S.C. Section 1451(a) seeking to revoke defendant's citizenship. After extensive pretrial discovery

the case was tried, and for the reasons set forth in an opinion filed September 28, 1983 judgment was entered in favor of the defendant. Defendant now moves for an award of legal fees and expenses under the Equal Access to Justice Act, 28 U.S.C. Section 2412(b) and (d) and pursuant to Federal Rule of Civil Procedure 37(d).

The nature of this action and my findings of fact and conclusions of law are set forth in my September 28 opinion, 571 F.Supp. 1104. They need not be repeated here. For present purposes suffice it to say: First, I concluded that under the circumstances of this case the deposition testimony upon which the government relied was inadmissible except for very limited purposes. Second, I held that upon exclusion of that testimony the government had failed to establish by evidence that was clear, unequivocal and convincing that defendant had participated in the slaughter of more than 2,000 Jewish residents of the Lithuanian village of Kedainiai in August of 1941. Third, I held that although defendant made repeated misrepresentations as to four matters in his application for a visa and for naturalization, this did not constitute illegal procurement or procurement by concealment of a material fact or by wilful misrepresentation under 8 U.S.C. Section 1451(a) as interpreted and applied by the United States Supreme Court.

Having prevailed on the merits, defendant is entitled to costs under 28 U.S.C. Section 2412(a).

■ In part, defendant bases his application for attorney's fees and costs in addition to those allowed under Section 2412(a) on Rule 37(d), which authorizes a court to impose attorney's fees upon a party or his attorney who failed to comply with discovery obligations. At this late date I do not intend, nor do I think I am authorized or required, to review all the charges and countercharges regarding the conduct of discovery in this case. If there were delinquencies in that regard, the time to have sought imposition of a penalty was when the improper conduct occurred. Then the judge who was hearing the case would have been in a position to evaluate the situation and make an appropriate disposition. Rule 37(d) was not intended to permit a party after conclusion of a case to reopen and reargue matters long buried and forgotten.

Thus the basis for any fee award must be under 28 U.S.C. Section 2412(d)(1)(A) which provides:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the Court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

■ Defendant is a prevailing party and as such is entitled to attorney's fees unless the government carries its burden of establishing that its position was substantially justified. *Dougherty v. Lehman,* 711 F.2d 555 (3d Cir.1983). Thus not every prevailing party is entitled to an award of attorney's fees—only those who are parties to a case in which the government's position was not substantially justified. To determine whether the government's position was substantially justified the trial court must look to the record in the case, the factors and reasoning found in the Court's opinion, the relevant documents filed at each stage of the proceedings, actions taken by the government after legal proceedings had commenced and affidavits filed in connection with the fee application. *Dougherty supra* at 562.

As stated in *Dougherty* at 564, for the government to show that its position had a reasonable basis in both law and fact it must:

"First, show that there is a reasonable basis in truth for the facts alleged in the pleadings. If no such basis for the government's factual allegations exist,

then the government's position may well be held not to be 'substantially justified.'

Second, the government must show that there exists a reasonable basis in law for the theory which it propounds. This is not to say the government need demonstrate that there is a substantial probability that the legal theory advanced by it will succeed. See House Reports, supra, at 11, 1980 U.S. Code Cong. & Ad.News, 4490.

Finally, the government must show that the facts alleged will reasonably support the legal theories advanced. Thus, having met these requirements, if the government's legal theory as applied to the facts reasonably supports the Secretary's position, even though the government may not have ultimately prevailed, then the government will have proven that the 'position of the United States was substantially justified'."

■ I conclude that the government has met these three criteria and has established a reasonable basis for its position.

First as to the basis for the facts alleged in the pleadings:

The government conducted extensive and responsible investigation of the charges it brought against defendant. It discovered that in his immigration and naturalization papers the defendant had given false information as to his date and place of birth and certain other matters. Although not all of the alleged falsehoods were proved at the trial, four such falsehoods were established and defendant admitted three of them.

The most serious charge in the complaint was that the defendant had participated in the killing of Kedainiai's Jewish population. At the time the complaint was filed the government had received from Soviet authorities 14 written protocols or statements of Lithuanian eyewitnesses to the Kedainiai killings. The statements were taken by Soviet authorities in 1976 and 1977 or, in the case of Vladas Gylys in 1981.

The makers of seven of these protocols identified the defendant as one of the civilians who actively participated in the killings. The makers of the other seven protocols either did not know defendant or otherwise were unable to state that he participated in the killings. As of the date of the filing of the complaint the government could have expected that it would be able to take the testimony of all these people to establish both the fact of the killings and the fact of defendant's participation in them.

During the pretrial discovery period the government noticed the depositions of five of the seven witnesses who alleged in their protocols that defendant took part in the killings. However, when the depositions commenced on April 17, 1982 in Vilnius, the Soviet Procurator announced that three of the seven persons who claimed to have seen defendant at the death site would not be available for deposition because of ill health, namely Jouzas Beranski, Andrius Vitkauskas and Vladas Gylys. I had not realized until the present fee application that the Soviet authorities had removed these three persons as witnesses. It adds to one's doubts about the reliability of the deposition testimony that was actually taken, but it could hardly have been anticipated by the government and in no way detracts from the pretrial basis for bringing the suit.

With the elimination of these three witnesses the government was left with two persons who, in their protocols, claimed to have identified defendant, namely Jonas Dailide and Juozas Kriunas. In addition Vladislovas Silvestravicius, who in his protocol asserted he did not know defendant, identified him in a highly tentative manner during his deposition testimony.

In my September opinion I set forth in detail the reasons why I excluded from evidence the deposition testimony which purported to link defendant to the killings. These reasons, for the most part, became fully apparent to me only after a complete review of the trial testimony and other evidence. The significance of most of the factors upon which I relied reasonably might not have been appreciated by the government during the course of the dis-

covery or even until after the close of the case. While the government must have known of the Soviet Union's intense interest in the case and the nature of the Soviet Union's legal system, those facts alone would not have required exclusion of the deposition testimony. The manner of conducting the depositions, the questionable elements of the testimony and the refusal or failure of the Soviet Union to provide critical prior testimony or earlier protocols had a cumulative effect ultimately requiring an evidence ruling adverse to the government. This resulted in the government losing the case, but it does not justify the conclusion that the government lacked a reasonable basis for the facts alleged in the pleadings.

I criticized the government for failing to do more to test the reliability of the deposition testimony. Had it done so, it might have established the reliability of the testimony or it might have shown the testimony to be worthless. The price of this failure is the exclusion of the evidence. It does not render the government's overall position in the case unjustified.

Second, as to the government's showing that there exists a reasonable basis in the law for the theory it propounds:

As set forth in my September opinion, there were certain interpretations of the law which the government advanced with which I disagreed. However, the general propositions of law relied upon the government concerning forfeiture of citizenship under 8 U.S.C. Section 1451(a) were hornbook law recognized in the recent trial court and appellate cases. There was substantial justification for the legal theories for the most part as urged by the government.

Third, as to a showing the facts alleged would reasonably support the legal theories advanced:

Had the government been able to establish that the defendant had actively participated in the mass killing of the Jews in Kedainiai, there is no doubt the government would have succeeded in obtaining a judgment revoking his citizenship. In those circumstances his citizenship would have been illegally procured within the meaning of 8 U.S.C. Section 1451(a) since, to put it mildly, he would not have been a person of good moral character and thus would have been ineligible for citizenship under 8 U.S.C. Section 1427(a)(3). It is unnecessary to consider the alternative bases for revocation of defendant's citizenship had the government established its participation in the killings by admissible evidence.

I conclude, therefore, that notwithstanding its loss of the case, the government was substantially justified in instituting and prosecuting it. Defendant is not, therefore, entitled to attorney's fees under 28 U.S.C. Section 2412(d)(1)(A).

The determination that defendant is not entitled to attorney's fees under the statute in no way detracts from the substantial legal services performed by defendant's attorneys in the defense of this extraordinarily difficult case. Before these attorneys undertook representation of defendant, a number of attorneys turned him down—in part, no doubt, because of the extreme unpopularity of the cause, and in part because there was a likelihood that defendant would be unable to pay for all the legal work which would be necessary.

The subject of attorney's fees points up the potential for terrible injustice inherent in this very unusual kind of case. Denaturalization proceedings based on charges of World War II war crimes carry with them consequences far more severe than the penalties imposed in most criminal cases. Not only is a defendant threatened with loss of his citizenship; he faces deportation to a hostile jurisdiction having safeguards and procedures far different from our own where he may be tried and sentenced to imprisonment and even execution.

Arrayed against the defendant are the investigative and prosecutorial resources of the United States and of the Soviet Union. As shown in the government's papers opposing the defendant's fee application, these investigations are conducted in the

Soviet Union and Eastern Europe, in Western Europe, Israel and the United States.

The acts of which the defendant is accused took place more than 40 years ago. Some witnesses have died, others are scattered throughout the world, many in places where a defendant's investigators, if he could afford them, would be unable to travel to question people freely. Pertinent records and documents likewise are scattered, some being located in places inaccessible to a defendant.

Only a person of great wealth could command the services of attorneys, investigators, translators and expert witnesses and assemble the other resources needed to meet properly the government's wide ranging proofs. Most of the defendants in these cases appear to be persons of modest means with only limited assistance available to them from interested groups or individuals.

Further, these cases inevitably are conducted in a highly charged emotional atmosphere generated by the unspeakable events out of which the charges arise. Thus there are few, if any, attorneys willing to take on representation on a pro bono basis and few, if any, individuals or private organizations which would be willing to contribute to pay the enormous costs of litigation.

The attorney's fee provisions of 28 U.S.C. Section 2412(b) do little to ameliorate the situation. The likelihood of a defendant both prevailing on the merits and defeating the government's proofs that its position was substantially justified is so slight that the statute provides small inducement to prospective defense attorneys.

The great disparity between defense and government resources, the enormous expenses involved in testing or meeting the government's proofs, the very limited resources of the typical defendant and the fearful consequences which attend the government's success create the potential for injustice to which I refer. It would be terrible to contemplate even one defendant wrongly losing his citizenship and being deported and tried in a foreign jurisdiction for lack of adequate legal and investigative resources.

Due process questions may be implicated. If so, they were not raised in this case. I refer to the point since this case so graphically illustrates it.

The government's attorneys are requested to submit a form of order denying defendant's application under Federal Rule of Civil Procedure 37(d) and under 28 U.S.C. Section 2412(d)(1)(A).